**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF TEXAS, AUSTIN DIVISION**

| | | |
|---|---|---|
| SLUICEBOX, INC., a Delaware corporation,<br>    Plaintiff | §<br>§<br>§ | |
| v. | §<br>§ | Civil Action No.:   26-cv-00651 |
| EMI AYADA, an individual,<br>    Defendant | §<br>§<br>§ | |

**COMPLAINT FOR VIOLATION OF THE U.S. COMPUTER FRAUD AND ABUSE ACT; U.S. DEFEND TRADE SECRETS ACT; TEXAS UNIFORM TRADE SECRETS ACT; TEXAS HARMFUL ACCESS BY COMPUTER ACT; AND BREACH OF CONTRACT**

---

**COMPLAINT**                                                                 Page | 1

Plaintiff Sluicebox, Inc. ("Sluicebox") alleges against Defendant Emi Ayada, as follows:

## INTRODUCTION

1.      Sluicebox is a start-up company that develops artificial intelligence models to measure the carbon emissions associated with physical electronic products. Electronics and semiconductor manufacturers are increasingly required to understand and report the environmental impact of what they produce, but the necessary data is often incomplete, inconsistent, or difficult to analyze. Sluicebox addresses this problem by building and applying AI models that estimate and organize emissions data across complex supply chains. Sluicebox's platform uses these models to calculate the carbon footprint of individual parts and finished products and to generate life cycle assessments, which are standardized reports used for regulatory compliance, customer disclosures, and internal decision-making. Sluicebox's cutting-edge approach allows companies to perform these analyses quickly and at scale, rather than relying on slow and expensive manual processes conducted by consultants. Sluicebox's customers include numerous semiconductor and electronics manufacturers in the Fortune 500.

2.      Emi Ayada is a former Sluicebox technical executive who was fired for cause on March 18, 2026, after Sluicebox discovered that (1) Defendant Ayada had initiated and completed a Google Takeout of every file Defendant Ayada had access to within Sluicebox's Google cloud platform on February 12, 2026; (2) had forwarded to her personal email Sluicebox confidential information, trade secrets, and attorney-client privileged communications on at least seven separate occasions between December 22, 2025 to February 10, 2026; and (3) downloaded at least thirteen highly sensitive Sluicebox documents from Sluicebox's Google cloud platform between November 18, 2025 and February 20, 2026.

3.      These acts violated Defendant Ayada's Confidential Information and Invention Assignment Agreement (the "Confidentiality Agreement") with Sluicebox, as well as Sluicebox's Data Management Policy and related data security requirements governing the access, use, and transfer of Sluicebox data and information.

4.      Sluicebox therefore brings this action to secure its confidential information and trade secrets, and to remedy Defendant Ayada's violation of federal and Texas trade secret and computer access statutes, as well as her breach of contract.

## PARTIES

5.      Sluicebox is a Delaware corporation headquartered in Austin Texas. Sluicebox was founded by Sarah Tang on November 3, 2023.

6.      Emi Ayada, f/k/a Emi Usuyama, is a former Sluicebox employee who, on information and belief, resides in Sammamish, Washington. Defendant Ayada began working with Sluicebox in early 2024 and became a full-time employee in June 2024.

## JURISDICTION AND VENUE

7.      This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Sluicebox alleges causes of action arising under federal law. The Court independently has subject matter jurisdiction pursuant to 28 U.S.C. § 1332 because there is complete diversity between the parties and the amount in controversy exceeds $75,000.

8.      This Court has personal jurisdiction over Defendant Ayada because Defendant Ayada was employed by Sluicebox and purposefully directed her tortious conduct against Sluicebox, which is headquartered in Austin, Texas. In addition, Defendant Ayada's Confidentiality Agreement provides that Texas law governs the agreement and all acts and transactions pursuant thereto.

9.      Venue in this District is proper pursuant to 28 U.S.C. § 1391 because a substantial part of the events and omissions giving rise to the claim (including the creation of the relevant trade secrets and the injury from their unlawful theft) occurred in this District, and/or a substantial part of the property that is the subject of the action is situated in this District.

## FACTUAL ALLEGATIONS

**A.      Defendant Ayada's Confidentiality Agreement and Sluicebox Data Policies**

10.      On or about March 14, 2024, Defendant Ayada entered into a Confidentiality Agreement with Sluicebox. A copy of the executed Confidentiality Agreement is appended hereto as **Exhibit 1**.

11.      In Section 2(a) of the Confidentiality Agreement, Defendant Ayada agreed that she would "not . . . make copies of . . . Confidential Information except as authorized by the Company."

12.      Section 2(b) of the Confidentiality Agreement defines "Confidential Information" as follows:

> information and physical material not generally known or available outside the Company and information and physical material entrusted to the Company in confidence by third parties. Confidential Information includes, without limitation: (i) Company Inventions (as defined below); and (ii) technical data, trade secrets, know-how, research, product or service ideas or plans, software codes and designs, algorithms, developments, inventions, patent applications, laboratory notebooks, processes, formulas, techniques, biological materials, mask works, engineering designs and drawings, hardware configuration information, agreements with third parties, lists of, or information relating to, employees and consultants of the Company (including, but not limited to, the names, contact information, jobs, compensation, and expertise of such employees and consultants), lists of, or information relating to, suppliers and customers (including, but not limited to, customers of the Company on whom I called or with whom I became acquainted during the Relationship), price lists, pricing methodologies, cost data, market share data, marketing plans, licenses, contract information, business plans, financial forecasts, historical financial data, budgets or other business information disclosed to me by the Company either directly or indirectly, whether in writing, electronically, orally, or by observation.

13.      Sluicebox's Data Management Policy was in effect at all relevant times, and provides that confidential and restricted information and data are not to be stored on personal devices and are not to be transferred to people or entities outside of Sluicebox absent "a legal contract or arrangement or as mandated by law or regulation, and the explicit written permission

of management or the data owner." The Data Management Policy is appended hereto as **Exhibit 2**.

**B.      Defendant Ayada's Takes Proprietary Sluicebox Data and Documents**

14.      Between December 22, 2025, and February 10, 2026, Defendant Ayada forwarded Sluicebox correspondence and/or documents from her Sluicebox email to her personal email on at least seven different occasions. These materials included attorney-client privileged correspondence with Sluicebox's outside counsel Mintz LLP; lists of Sluicebox's investors and their contact information; confidential communications and agreements with some of Sluicebox's most important customers; documents regarding Sluicebox's fundraising efforts, stock issuance, investors, and board consents; and Sluicebox funding agreements.

15.      On February 12, 2026, Defendant Ayada initiated and completed a Google Takeout of all data to which she had access to on Sluicebox's Google cloud platform, including Sluicebox's Google Drive document storage system:



16.      As described on Google's own website, the function of Google Takeout is to export all data to which a user has access:

← Google Takeout

Your account, your data.
Export a copy of content in your Google Account to back it up or use it with a service outside of Google.

17.      Defendant Ayada also downloaded highly sensitive Sluicebox documents from Sluicebox's Google platform on at least thirteen different occasions between November 18, 2025 and February 20, 2026. The downloaded documents include some of the most sensitive Sluicebox documents Defendant Ayada had access to, including technical due diligence

documents, Sluicebox strategy and restructuring plans, data sets that Sluicebox's proprietary AI references in order to perform its functions, internal memoranda, and confidential bills of material provided by Sluicebox customers.

18.    Since approximately November 2025, Defendant Ayada has been surreptitiously meeting with technical employees from other startups without prior disclosure to Sluicebox. On information and belief, these meetings included discussions of launching new ventures that would compete with Sluicebox and/or use Sluicebox trade secrets and confidential information.

19.    The materials within Defendant Ayada's unauthorized downloads, forwards to her personal email account, and Google Takeout requests include Sluicebox trade secrets and confidential information.

20.    Defendant Ayada's unauthorized Google Takeout request, forwarding of Sluicebox confidential documents and correspondence to her personal email, and downloads of confidential Sluicebox materials also violated her contractual obligations under the CIIAA and Sluicebox's data protection policies, which strictly limit the transfer and storage of confidential information outside approved systems and without authorization.

21.    Defendant Ayada's unauthorized Google Takeout request, forwarding of Sluicebox confidential documents and correspondence to her personal email, and downloads of confidential Sluicebox materials all exceeded her limited authorized access to Sluicebox systems.

22.    The value of the trade secrets and confidential information which Defendant Ayada has misappropriated easily exceeds $75,000.

**FIRST CAUSE OF ACTION**

**(Violation of Computer Fraud and Abuse Act, 18 U.S.C. § 1030)**

23.    Sluicebox incorporates and realleges all of the above paragraphs as though fully set forth herein.

24.    Sluicebox's computer systems are used in affecting interstate commerce and communication and are therefore "protected computers" pursuant to 18 U.S.C. § 1030(e)(2)(B).

25.     Sluicebox provided Defendant Ayada with limited access to its computers (including its cloud Google platform) to conduct business during the time she was an employee of Sluicebox and only in her capacity as a Sluicebox employee.

26.     While employed at Sluicebox, Defendant Ayada intentionally accessed and downloaded confidential information and trade secrets which she was not authorized to access on Sluicebox's computer systems.

27.     Defendant Ayada acted knowingly and with the intent to defraud Sluicebox by appropriating its confidential information and interfering with its relationships with customers and investors.

28.     As a result of Defendant Ayada's unauthorized access to Sluicebox's computer systems, and her access to Sluicebox's computer systems which exceeded her authorized access, Defendant Ayada obtained valuable confidential information and trade secrets of Sluicebox.

29.     As a result of Defendant Ayada's unauthorized access to Sluicebox's computer systems, and her access to Sluicebox's computer systems which exceeded her authorized access, Defendant Ayada recklessly caused damage to Sluicebox exceeding $75,000, including the cost of investigating, analyzing, and responding to Defendant Ayada's actions.

30.     Defendant Ayada's actions herein were done maliciously, oppressively, fraudulently and in bad faith, entitling Sluicebox to punitive damages.

## SECOND CAUSE OF ACTION

### (Violation of the Defend Trade Secrets Act, 18 U.S.C §§ 1836, *et seq*.)

31.     Sluicebox incorporates and realleges all of the above paragraphs as though fully set forth herein.

32.     Sluicebox possesses trade secrets including, without limitation, its AI technology, its customer and investor lists, and proprietary bills of materials.

33.     Sluicebox protects its trade secrets and intellectual property, by, among other things, limiting access to its computer systems, requiring password protections, Sluicebox protects its trade secrets and confidential information, including its proprietary data processing

systems, algorithms, customer data, and internal tooling, through a combination of technical, administrative, and contractual safeguards. These measures include, among other things, restricting access to sensitive systems and data to authorized personnel on a need-to-know basis; implementing robust authentication protocols such as password protections and multi-factor authentication; enforcing policies requiring strong, unique passwords; maintaining access logs and continuous monitoring systems to detect and prevent unauthorized access; and utilizing secure cloud infrastructure and encryption to protect data in transit and at rest. Sluicebox maintains a comprehensive information security program aligned with industry standards, including SOC 2 security principles, and employs automated compliance and monitoring tools (including Vanta) to enforce and audit its security controls on an ongoing basis. Sluicebox further limits external exposure of its proprietary systems, ensures that sensitive technology is not publicly accessible, and strictly controls the dissemination of internal materials.In addition, Sluicebox requires its employees, contractors, and business partners to enter into confidentiality and non-disclosure agreements and implements internal policies and training designed to safeguard sensitive information.

34.    Defendant Ayada misappropriated trade secrets of Sluicebox.

35.    Sluicebox has suffered and will continue to suffer harm as a result of Defendant Ayada's appropriation of its trade secrets, including, without limitation, monetary harm, loss of goodwill, and loss of business opportunities.

36.    Defendant Ayada's actions herein were done maliciously, oppressively, fraudulently and in bad faith, entitling Plaintiffs to punitive damages.

**THIRD CAUSE OF ACTION**

**(Violation of the Texas Uniform Trade Secrets Act,**

**Tex. Civ. Prac. & Rem. Code 134A.001, *et seq*.)**

37.    Sluicebox incorporates and realleges all of the above paragraphs as though fully set forth herein.

38.     Sluicebox possesses trade secrets including, without limitation, its AI technology, its customer and investor lists, and proprietary bills of materials.

39.     Defendant Ayada misappropriated trade secrets of Sluicebox.

40.     Sluicebox has suffered and will continue to suffer harm as a result of Defendant Ayada's appropriation of its trade secrets, including, without limitation, monetary harm, loss of goodwill, and loss of business opportunities.

41.     Defendant Ayada's actions herein were done maliciously, oppressively, fraudulently and in bad faith, entitling Plaintiffs to punitive damages.

## FOURTH CAUSE OF ACTION

### (Violation of the Texas Harmful Access by Computer Act,

### Tex. Civ. Prac. & Rem. Code 143.001, *et seq*.)

42.     Sluicebox incorporates and realleges all of the above paragraphs as though fully set forth herein.

43.     Defendant Ayada knowingly accessed Sluicebox's computers, computer network, and computer systems in a manner that exceeded Sluicebox's effective consent.

44.     Sluicebox has suffered and will continue to suffer harm as a result of Defendant Ayada's appropriation of its trade secrets, including, without limitation, monetary harm, loss of goodwill, and loss of business opportunities.

45.     Defendant Ayada's actions herein were done maliciously, oppressively, fraudulently and in bad faith, entitling Plaintiffs to punitive damages.

## FIFTH CAUSE OF ACTION

### (Breach of Contract)

46.     Sluicebox incorporates and realleges all of the above paragraphs as though fully set forth herein.

47.     The Confidentiality Agreement is a valid contract between Defendant Ayada and Sluicebox.

48.     Sluicebox tendered performance and/or was excused from doing so.

**COMPLAINT**                                                                      Page | 10

49.     Defendant Ayada breached the terms of the Confidentiality Agreement.

50.     Sluicebox has sustained damages as a result of Defendant Ayada's breach.

DATED: March 18, 2026

SIDEMAN & BANCROFT LLP

John van Loben Sels
TX State Bar No. 794780
One Embarcadero Center, Twenty-Second Floor
San Francisco, California 94111-3711
Telephone:  (415) 392-1960
Fax:  (415) 392-0827
jvanlobensels@sideman.com

Ronald J. Fisher
CA State Bar No. 298660
(*pro hac vice* forthcoming)
rfisher@sideman.com

## JURY DEMAND

Sluicebox, Inc. demands a trial by jury for all claims so triable.

DATED: March 18, 2026

SIDEMAN & BANCROFT LLP

John van Loben Sels
TX State Bar No. 794780
One Embarcadero Center, Twenty-Second Floor
San Francisco, California 94111-3711
Telephone:  (415) 392-1960
Fax:  (415) 392-0827
jvanlobensels@sideman.com

Ronald J. Fisher
CA State Bar No. 298660
(*pro hac vice* forthcoming)
rfisher@sideman.com

# EXHIBIT 1

**SLUICEBOX, INC.**

**CONFIDENTIAL INFORMATION AND
INVENTION ASSIGNMENT AGREEMENT**

*Employee Name:*  **Emi Ayada**

*Effective Date:*  **March 14, 2024**

As a condition of my becoming employed (or my employment being continued) by Sluicebox, Inc., a Delaware corporation, or any of its current or future subsidiaries, affiliates, successors or assigns (collectively, the "Company"), and in consideration of my employment with the Company and my receipt of the compensation now and hereafter paid to me by the Company, the receipt of Confidential Information (as defined below) while associated with the Company, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, I agree to the following:

1.      **Relationship.**  This Confidential Information and Invention Assignment Agreement (this "Agreement") will apply to my employment relationship with the Company.  If that relationship ends and the Company, within a year thereafter, either reemploys me or engages me as a consultant, I agree that this Agreement will also apply to such later employment or consulting relationship, unless the Company and I otherwise agree in writing.  Any such employment or consulting relationship between the parties hereto, whether commenced prior to, upon or after the date of this Agreement, is referred to herein as the "Relationship."

2.      **Confidential Information.**

(a)      **Protection of Information.**  I understand that during the Relationship, the Company intends to provide me with information, including Confidential Information (as defined below), without which I would not be able to perform my duties to the Company.  I agree, at all times during the term of the Relationship and thereafter, to hold in strictest confidence, and not to use, except for the benefit of the Company to the extent necessary to perform my obligations to the Company under the Relationship, and not to disclose to any person, firm, corporation or other entity, without written authorization from the Company in each instance, any Confidential Information that I obtain, access or create during the term of the Relationship, whether or not during working hours, until such Confidential Information becomes publicly and widely known and made generally available through no wrongful act of mine or of others who were under confidentiality obligations as to the item or items involved.  I further agree not to make copies of such Confidential Information except as authorized by the Company.

(b)      **Confidential Information.**  I understand that "Confidential Information" means information and physical material not generally known or available outside the Company and information and physical material entrusted to the Company in confidence by third parties. Confidential Information includes, without limitation:  (i) Company Inventions (as defined below); and (ii) technical data, trade secrets, know-how, research, product or service ideas or plans, software codes and designs, algorithms, developments, inventions, patent applications,

laboratory notebooks, processes, formulas, techniques, biological materials, mask works, engineering designs and drawings, hardware configuration information, agreements with third parties, lists of, or information relating to, employees and consultants of the Company (including, but not limited to, the names, contact information, jobs, compensation, and expertise of such employees and consultants), lists of, or information relating to, suppliers and customers (including, but not limited to, customers of the Company on whom I called or with whom I became acquainted during the Relationship), price lists, pricing methodologies, cost data, market share data, marketing plans, licenses, contract information, business plans, financial forecasts, historical financial data, budgets or other business information disclosed to me by the Company either directly or indirectly, whether in writing, electronically, orally, or by observation.

(c)   **Third Party Information.**  My agreements in this Section 2 are intended to be for the benefit of the Company and any third party that has entrusted information or physical material to the Company in confidence.  I further agree that, during the term of the Relationship and thereafter, I will not improperly use or disclose to the Company any confidential, proprietary or secret information of my former employer(s) or any other person, and I agree not to bring any such information onto the Company's property or place of business.

(d)   **Other Rights.**  This Agreement is intended to supplement, and not to supersede, any rights the Company may have in law or equity with respect to the protection of trade secrets or confidential or proprietary information.

(e)   **U.S. Defend Trade Secrets Act.**  Notwithstanding the foregoing, the U.S. Defend Trade Secrets Act of 2016 ("DTSA") provides that an individual shall not be held criminally or civilly liable under any federal or state trade secret law for the disclosure of a trade secret that is made (i) in confidence to a federal, state, or local government official, either directly or indirectly, or to an attorney; and (ii) solely for the purpose of reporting or investigating a suspected violation of law; or (iii) in a complaint or other document filed in a lawsuit or other proceeding, if such filing is made under seal.  In addition, DTSA provides that an individual who files a lawsuit for retaliation by an employer for reporting a suspected violation of law may disclose the trade secret to the attorney of the individual and use the trade secret information in the court proceeding, if the individual (A) files any document containing the trade secret under seal; and (B) does not disclose the trade secret, except pursuant to court order.

3.   **Ownership of Inventions.**

(a)   **Inventions Retained and Licensed.**  I have attached hereto, as Exhibit A, a complete list describing with particularity all Inventions (as defined below) that, as of the Effective Date:  (i) I made, and/or (ii) belong solely to me or belong to me jointly with others or in which I have an interest, and that relate in any way to any of the Company's actual or proposed businesses, products, services, or research and development, and which are not assigned to the Company hereunder; or, if no such list is attached, I represent that there are no such Inventions at the time of signing this Agreement, and to the extent such Inventions do exist and are not listed on Exhibit A, I hereby forever waive any and all rights or claims of ownership to such Inventions.  I understand that my listing of any Inventions on Exhibit A does not constitute an acknowledgement by the Company of the existence or extent of such Inventions,

2

nor of my ownership of such Inventions.  I further understand that I must receive the formal approval of the Company before commencing my Relationship with the Company.

(b)    **Use or Incorporation of Inventions.**  If in the course of the Relationship, I use or incorporate into a product, service, process or machine any Invention not covered by Section 3(d) of this Agreement in which I have an interest, I will promptly so inform the Company in writing.  Whether or not I give such notice, I hereby irrevocably grant to the Company a nonexclusive, fully paid-up, royalty-free, assumable, perpetual, worldwide license, with right to transfer and to sublicense, to practice and exploit such Invention and to make, have made, copy, modify, make derivative works of, use, sell, import, and otherwise distribute such Invention under all applicable intellectual property laws without restriction of any kind.

(c)    **Inventions.**  I understand that "Inventions" means discoveries, developments, concepts, designs, ideas, know how, improvements, inventions, trade secrets and/or original works of authorship, whether or not patentable, copyrightable or otherwise legally protectable.  I understand this includes, but is not limited to, any new product, machine, article of manufacture, biological material, method, procedure, process, technique, use, equipment, device, apparatus, system, compound, formulation, composition of matter, design or configuration of any kind, or any improvement thereon.  I understand that "Company Inventions" means any and all Inventions that I may solely or jointly author, discover, develop, conceive, or reduce to practice during the period of the Relationship, except as otherwise provided in Section 3(g) below.

(d)    **Assignment of Company Inventions.**  I hereby assign to the Company, or its designee, and I agree that I will promptly make full written disclosure to the Company of and to hold in trust for the sole right and benefit of the Company, all my right, title and interest throughout the world in and to any and all Company Inventions and all patent, copyright, trademark, trade secret and other intellectual property rights therein.  I hereby waive and irrevocably quitclaim to the Company or its designee any and all claims, of any nature whatsoever, that I now have or may hereafter have for infringement of any and all Company Inventions.  I further acknowledge that all Company Inventions that are made by me (solely or jointly with others) within the scope of and during the period of the Relationship are "works made for hire" (to the greatest extent permitted by applicable law) and are compensated by my salary.  Any assignment of Company Inventions includes all rights of attribution, paternity, integrity, modification, disclosure and withdrawal, and any other rights throughout the world that may be known as or referred to as "moral rights," "artist's rights," "droit moral," or the like (collectively, "Moral Rights").  To the extent that Moral Rights cannot be assigned under applicable law, I hereby waive and agree not to enforce any and all Moral Rights, including, without limitation, any limitation on subsequent modification, to the extent permitted under applicable law.

(e)    **Maintenance of Records.**  I agree to keep and maintain adequate and current written records of all Company Inventions made or conceived by me (solely or jointly with others) during the term of the Relationship.  The records may be in the form of notes, sketches, drawings, flow charts, electronic data or recordings, laboratory notebooks, or any other format.  The records will be available to and remain the sole property of the Company at all times.  I agree not to remove such records from the Company's place of business except as

3

expressly permitted by Company policy which may, from time to time, be revised at the sole election of the Company for the purpose of furthering the Company's business.  I agree to deliver all such records (including any copies thereof) to the Company at the time of termination of the Relationship as provided for in Section 4 and Section 5.

(f)     **Patent and Copyright Rights.**  I agree to assist the Company, or its designee, at its expense, in every proper way to secure the Company's, or its designee's, rights in the Company Inventions and any copyrights, patents, trademarks, mask work rights, Moral Rights, or other intellectual property rights relating thereto in any and all countries, including the disclosure to the Company or its designee of all pertinent information and data with respect thereto, the execution of all applications, specifications, oaths, assignments, recordations, and all other instruments which the Company or its designee shall deem necessary in order to apply for, obtain, maintain and transfer such rights, or if not transferable, waive and agree never to assert such rights, and in order to assign and convey to the Company or its designee, and any successors, assigns and nominees the sole and exclusive right, title and interest in and to such Company Inventions, and any copyrights, patents, mask work rights or other intellectual property rights relating thereto.  I further agree that my obligation to execute or cause to be executed, when it is in my power to do so, any such instrument or papers shall continue during and at all times after the end of the Relationship and until the expiration of the last such intellectual property right to expire in any country of the world.  I hereby irrevocably designate and appoint the Company and its duly authorized officers and agents as my agent and attorney-in-fact, to act for and in my behalf and stead to execute and file any such instruments and papers and to do all other lawfully permitted acts to further the application for, prosecution, issuance, maintenance or transfer of letters patent, copyright, mask work and other registrations related to such Company Inventions.  This power of attorney is coupled with an interest and shall not be affected by my subsequent incapacity.

(g)     **Exception to Assignments.**  Subject to the requirements of applicable state law, if any, I understand that the Company Inventions will not include, and the provisions of this Agreement requiring assignment of inventions to the Company do not apply to, any invention that qualifies fully for exclusion under the provisions of applicable state law, if any.  In order to assist in the determination of which inventions qualify for such exclusion, I will advise the Company promptly in writing, during and for a period of twelve (12) months immediately following the termination of the Relationship, of all Inventions solely or jointly conceived or developed or reduced to practice by me during the period of the Relationship.  In addition, I acknowledge receipt of the written notification attached hereto as Exhibit B.

4.     **Company Property; Returning Company Documents.**  I acknowledge and agree that I have no expectation of privacy with respect to the Company's telecommunications, networking or information processing systems (including, without limitation, files, e-mail messages, and voice messages) and that my activity and any files or messages on or using any of those systems may be monitored or reviewed at any time without notice.  I further agree that any property situated on the Company's premises and owned by the Company, including disks and other storage media, filing cabinets or other work areas, is subject to inspection by Company personnel at any time with or without notice.  I agree that, at the time of termination of the Relationship, I will deliver to the Company (and will not keep in my possession, recreate or deliver to anyone else) any and all devices, records, data, notes, reports, proposals, lists,

4

correspondence, specifications, drawings, blueprints, sketches, laboratory notebooks, materials, flow charts, equipment, other documents or property, or reproductions of any of the aforementioned items developed by me pursuant to the Relationship or otherwise belonging to the Company, its successors or assigns.

5.    **Termination Certification.**  In the event of the termination of the Relationship, I agree to sign and deliver the "Termination Certification" attached hereto as Exhibit C; however, my failure to sign and deliver the Termination Certification shall in no way diminish my continuing obligations under this Agreement.

6.    **Notice to Third Parties.**  I agree that during the periods of time during which I am restricted in taking certain actions by the terms of Section 7 of this Agreement (the "Restriction Period"), I shall inform any entity or person with whom I may seek to enter into a business relationship (whether as an owner, employee, independent contractor or otherwise) of my contractual obligations under this Agreement.  I also understand and agree that the Company may, with or without prior notice to me and during or after the term of the Relationship, notify third parties of my agreements and obligations under this Agreement.  I further agree that, upon written request by the Company, I will respond to the Company in writing regarding the status of my employment or proposed employment with any party during the Restriction Period.

7.    **Solicitation of Employees, Consultants and Other Parties.**  As described above, I acknowledge and agree that the Company's Confidential Information includes information relating to the Company's employees, consultants, customers and others, and that I will not use or disclose such Confidential Information except as authorized by the Company.  I further agree as follows:

(a)    **Employees, Consultants.** I agree that during the term of the Relationship, and for a period of twelve (12) months immediately following the termination of the Relationship for any reason, whether with or without cause, I shall not, directly or indirectly, solicit any of the Company's employees or consultants to terminate their relationship with the Company, or attempt to solicit employees or consultants of the Company, either for myself or for any other person or entity.

(b)    **Other Parties.**  I agree that during the term of the Relationship, I will not negatively influence any of the Company's clients, licensors, licensees or customers from purchasing Company products or services or solicit or influence or attempt to influence any client, licensor, licensee, customer or other person either directly or indirectly, to direct any purchase of products and/or services to any person, firm, corporation, institution or other entity in competition with the business of the Company.

8.    **At-Will Relationship.**  I understand and acknowledge that, except as may be otherwise explicitly provided in a separate written agreement between the Company and me, my Relationship with the Company is and shall continue to be at-will, as defined under applicable law, meaning that either I or the Company may terminate the Relationship at any time for any reason or no reason, without further obligation or liability, other than those provisions of this Agreement that explicitly continue in effect after the termination of the Relationship.

5

9.    **Representations and Covenants.**

(a)    **Facilitation of Agreement.**  I agree to execute promptly, both during and after the end of the Relationship, any proper oath, and to verify any proper document, required to carry out the terms of this Agreement, upon the Company's written request to do so.

(b)    **No Conflicts.**  I represent that my performance of all the terms of this Agreement does not and will not breach any agreement I have entered into, or will enter into, with any third party, including without limitation any agreement to keep in confidence proprietary information or materials acquired by me in confidence or in trust prior to or during the Relationship.  I will not disclose to the Company or use any inventions, confidential or non-public proprietary information or material belonging to any previous client, employer or any other party.  I will not induce the Company to use any inventions, confidential or non-public proprietary information, or material belonging to any previous client, employer or any other party.  I acknowledge and agree that I have listed on Exhibit A all agreements (e.g., non-competition agreements, non-solicitation of customers agreements, non-solicitation of employees agreements, confidentiality agreements, inventions agreements, etc.), if any, with a current or former client, employer, or any other person or entity, that may restrict my ability to accept employment with the Company or my ability to recruit or engage customers or service providers on behalf of the Company, or otherwise relate to or restrict my ability to perform my duties for the Company or any obligation I may have to the Company.  I agree not to enter into any written or oral agreement that conflicts with the provisions of this Agreement.

(c)    **Voluntary Execution.**  I certify and acknowledge that I have carefully read all of the provisions of this Agreement, that I understand and have voluntarily accepted such provisions, and that I will fully and faithfully comply with such provisions.

10.    **Electronic Delivery.**  Nothing herein is intended to imply a right to participate in any of the Company's equity incentive plans, however, if I do participate in such plan(s), the Company may, in its sole discretion, decide to deliver any documents related to my participation in the Company's equity incentive plan(s) by electronic means or to request my consent to participate in such plan(s) by electronic means.  I hereby consent to receive such documents by electronic delivery and agree, if applicable, to participate in such plan(s) through an on-line or electronic system established and maintained by the Company or a third party designated by the Company.

11.    **Miscellaneous.**

(a)    **Governing Law.**  The validity, interpretation, construction and performance of this Agreement, and all acts and transactions pursuant hereto and the rights and obligations of the parties hereto shall be governed, construed and interpreted in accordance with the laws of State of Texas without giving effect to the principles of conflict of laws.

(b)    **Entire Agreement.**  This Agreement sets forth the entire agreement and understanding between the Company and me relating to its subject matter and merges all prior discussions and agreements between us.  No amendment to this Agreement will be effective unless in writing signed by both parties to this Agreement.  The Company shall not be deemed

6

hereby to have waived any rights or remedies it may have in law or equity, nor to have given any authorizations or waived any of its rights under this Agreement, unless, and only to the extent, it does so by a specific writing signed by a duly authorized officer of the Company, it being understood that, even if I am an officer of the Company, I will not have authority to give any such authorizations or waivers for the Company under this Agreement without specific approval by the Board of Directors.  Any subsequent change or changes in my duties, obligations, rights or compensation will not affect the validity or scope of this Agreement.

(c)　**Successors and Assigns.**  This Agreement will be binding upon my heirs, executors, administrators and other legal representatives, and my successors and assigns, and will be for the benefit of the Company, its successors, and its assigns.

(d)　**Notices.**  Any notice, demand or request required or permitted to be given under this Agreement shall be in writing and shall be deemed sufficient when delivered personally or by overnight courier or sent by email, or 48 hours after being deposited in the U.S. mail as certified or registered mail with postage prepaid, addressed to the party to be notified at such party's address as set forth on the signature page, as subsequently modified by written notice, or if no address is specified on the signature page, at the most recent address set forth in the Company's books and records.

(e)　**Severability.**  If one or more of the provisions in this Agreement are deemed void or unenforceable to any extent in any context, such provisions shall nevertheless be enforced to the fullest extent allowed by law in that and other contexts, and the validity and force of the remainder of this Agreement shall not be affected.  The Company and I have attempted to limit my right to use, maintain and disclose the Company's Confidential Information, and to limit my right to solicit employees and customers only to the extent necessary to protect the Company from unfair competition.  Should a court of competent jurisdiction determine that the scope of the covenants contained in Section 7 exceeds the maximum restrictiveness such court deems reasonable and enforceable, the parties intend that the court should reform, modify and enforce the provision to such narrower scope as it determines to be reasonable and enforceable under the circumstances existing at that time.

(f)　**Remedies.**  I acknowledge and agree that violation of this Agreement by me may cause the Company irreparable harm, and therefore I agree that the Company will be entitled to seek extraordinary relief in court, including, but not limited to, temporary restraining orders, preliminary injunctions and permanent injunctions without the necessity of posting a bond or other security (or, where such a bond or security is required, I agree that a $1,000 bond will be adequate), in addition to and without prejudice to any other rights or remedies that the Company may have for a breach of this Agreement.

(g)　**Advice of Counsel.**  I ACKNOWLEDGE THAT, IN EXECUTING THIS AGREEMENT, I HAVE HAD THE OPPORTUNITY TO SEEK THE ADVICE OF INDEPENDENT LEGAL COUNSEL, AND I HAVE READ AND UNDERSTOOD ALL OF THE TERMS AND PROVISIONS OF THIS AGREEMENT.  THIS AGREEMENT SHALL NOT BE CONSTRUED AGAINST ANY PARTY BY REASON OF THE DRAFTING OR PREPARATION HEREOF.

7

(h)     **Counterparts.**  This Agreement may be executed in any number of counterparts, each of which when so executed and delivered shall be deemed an original, and all of which together shall constitute one and the same agreement.  Execution of a facsimile or scanned copy will have the same force and effect as execution of an original, and a facsimile or scanned signature will be deemed an original and valid signature.

*[Signature Page(s) Follow]*

8

The parties have executed this Confidential Information and Invention Assignment Agreement on the respective dates set forth below, to be effective as of the Effective Date first above written.

**THE COMPANY:**

**SLUICEBOX, INC.**

E-signed using Clerky (100183d8ff7c8cca635398757e2c18cd)

By: *Elmar Kert*

Elmar Kert, CEO

Date:  March 14, 2024

The parties have executed this Confidential Information and Invention Assignment Agreement on the respective dates set forth below, to be effective as of the Effective Date first above written.

**EMPLOYEE:**

**EMI AYADA**

E-signed using Clerky (b3fe0c65457134a026588224e0979ccf)

*Emi Ayada*

emi@sluicebox.ai

Date:  March 13, 2024

## EXHIBIT A

### LIST OF PRIOR INVENTIONS
### AND ORIGINAL WORKS OF AUTHORSHIP
### EXCLUDED UNDER SECTION 3(A)AND CONFLICTING AGREEMENTS
### DISCLOSED UNDER SECTION 9(B)

The following is a list of (i) all Inventions that, as of the Effective Date:  (A) I made, and/or (B) belong solely to me or belong to me jointly with others or in which I have an interest, and that relate in any way to any of the Company's actual or proposed businesses, products, services, or research and development, and which are not assigned to the Company and (ii) all agreements, if any, with a current or former client, employer, or any other person or entity, that may restrict my ability to accept employment with the Company or my ability to recruit or engage customers or service providers on behalf of the Company, or otherwise relate to or restrict my ability to perform my duties for the Company or any obligation I may have to the Company:

Prior Inventions:

None

Prior Agreements:

None

*[Signature Page(s) Follow]*

Except as indicated above on this <u>Exhibit A</u>, I have no inventions, improvements or original works to disclose pursuant to Section 3(a) of this Agreement and no agreements to disclose pursuant to Section 9(b) of this Agreement.

**EMPLOYEE:**

**EMI AYADA**

E-signed using Clerky (b3fe0c65457134a026588224e0979ccf)

*Emi Ayada*

emi@sluicebox.ai

Date:  March 13, 2024

## EXHIBIT B

## WRITTEN NOTIFICATION

The following written notification is provided to any employee whose relationship with the company is subject to the applicable provisions of state law below.

**Section 2870 of the California Labor Code is as follows:**

(a)     Any provision in an employment agreement which provides that an employee shall assign, or offer to assign, any of his or her rights in an invention to his or her employer shall not apply to an invention that the employee developed entirely on his or her own time without using the employer's equipment, supplies, facilities, or trade secret information except for those inventions that either:

(1)     Relate at the time of conception or reduction to practice of the invention to the employer's business, or actual or demonstrably anticipated research or development of the employer; or

(2)     Result from any work performed by the employee for the employer.

(b)     To the extent a provision in an employment agreement purports to require an employee to assign an invention otherwise excluded from being required to be assigned under subdivision (a), the provision is against the public policy of this state and is unenforceable.

**Chapter 765, Section 1060/2 of the Illinois Compiled Statutes is as follows:**

(1)     A provision in an employment agreement which provides that an employee shall assign or offer to assign any of the employee's rights in an invention to the employer does not apply to an invention for which no equipment, supplies, facilities, or trade secret information of the employer was used and which was developed entirely on the employee's own time, unless (a) the invention relates (i) to the business of the employer, or (ii) to the employer's actual or demonstrably anticipated research or development, or (b) the invention results from any work performed by the employee for the employer. Any provision which purports to apply to such an invention is to that extent against the public policy of this State and is to that extent void and unenforceable. The employee shall bear the burden of proof in establishing that his invention qualifies under this subsection.

(2)     An employer shall not require a provision made void and unenforceable by subsection (1) of this Section as a condition of employment or continuing employment. This Act shall not preempt existing common law applicable to any shop rights of employers with respect to employees who have not signed an employment agreement.

(3)     If an employment agreement entered into after January 1, 1984, contains a provision requiring the employee to assign any of the employee's rights in any invention to the employer, the employer must also, at the time the agreement is made, provide a written

notification to the employee that the agreement does not apply to an invention for which no equipment, supplies, facility, or trade secret information of the employer was used and which was developed entirely on the employee's own time, unless (a) the invention relates (i) to the business of the employer, or (ii) to the employer's actual or demonstrably anticipated research or development, or (b) the invention results from any work performed by the employee for the employer.

**Section 44-130 of the Kansas Labor and Industries Code is as follows:**

(a)    Any provision in an employment agreement which provides that an employee shall assign or offer to assign any of the employee's rights in an invention to the employer shall not apply to an invention for which no equipment, supplies, facilities or trade secret information of the employer was used and which was developed entirely on the employee's own time, unless:

(1)    The invention relates to the business of the employer or to the employer's actual or demonstrably anticipated research or development; or

(2)    the invention results from any work performed by the employee for the employer.

(b)    Any provision in an employment agreement which purports to apply to an invention which it is prohibited from applying to under subsection (a), is to that extent against the public policy of this state and is to that extent void and unenforceable. No employer shall require a provision made void and unenforceable by this section as a condition of employment or continuing employment.

(c)    If an employment agreement contains a provision requiring the employee to assign any of the employee's rights in any invention to the employer, the employer shall provide, at the time the agreement is made, a written notification to the employee that the agreement does not apply to an invention for which no equipment, supplies, facility or trade secret information of the employer was used and which was developed entirely on the employee's own time, unless:

(1)    The invention relates directly to the business of the employer or to the employer's actual or demonstrably anticipated research or development; or

(2)    the invention results from any work performed by the employee for the employer.

(d)    Even though the employee meets the burden of proving the conditions specified in this section, the employee shall disclose, at the time of employment or thereafter, all inventions being developed by the employee, for the purpose of determining employer and employee rights in an invention.

**Section 181.78, Subdivision 3 of the Minnesota Labor, Industry Code is as follows:**

If an employment agreement entered into after August 1, 1977 contains a provision requiring the employee to assign or offer to assign any of the employee's rights in any invention to an employer, the employer must also, at the time the agreement is made, provide a written notification to the employee that the agreement does not apply to an invention for which no equipment, supplies, facility or trade secret information of the employer was used and which was developed entirely on the employee's own time, and (1) which does not relate (a) directly to the business of the employer or (b) to the employer's actual or demonstrably anticipated research or development, or (2) which does not result from any work performed by the employee for the employer.

**Section 49.44.140 of the Washington Labor Regulations is as follows:**

(1)     A provision in an employment agreement which provides that an employee shall assign or offer to assign any of the employee's rights in an invention to the employer does not apply to an invention for which no equipment, supplies, facilities, or trade secret information of the employer was used and which was developed entirely on the employee's own time, unless (a) the invention relates (i) directly to the business of the employer, or (ii) to the employer's actual or demonstrably anticipated research or development, or (b) the invention results from any work performed by the employee for the employer. Any provision which purports to apply to such an invention is to that extent against the public policy of this state and is to that extent void and unenforceable.

(2)     An employer shall not require a provision made void and unenforceable by subsection (1) of this section as a condition of employment or continuing employment.

(3)     If an employment agreement entered into after September 1, 1979, contains a provision requiring the employee to assign any of the employee's rights in any invention to the employer, the employer must also, at the time the agreement is made, provide a written notification to the employee that the agreement does not apply to an invention for which no equipment, supplies, facility, or trade secret information of the employer was used and which was developed entirely on the employee's own time, unless (a) the invention relates (i) directly to the business of the employer, or (ii) to the employer's actual or demonstrably anticipated research or development, or (b) the invention results from any work performed by the employee for the employer.

3

## EXHIBIT C

### TERMINATION CERTIFICATION

This is to certify that I do not have in my possession, nor have I failed to return, any devices, records, data, notes, reports, proposals, lists, correspondence, specifications, drawings, blueprints, sketches, laboratory notebooks, flow charts, materials, equipment, other documents or property, or copies or reproductions of any aforementioned items belonging to Sluicebox, Inc., a Delaware corporation, its subsidiaries, affiliates, successors or assigns (collectively, the "Company").

I further certify that I have complied with all the terms of the Company's Confidential Information and Invention Assignment Agreement signed by me, including the reporting of any Inventions (as defined therein), conceived or made by me (solely or jointly with others) covered by that agreement, and I acknowledge my continuing obligations under that agreement.

I further agree that, in compliance with the Confidential Information and Invention Assignment Agreement, I will preserve as confidential all trade secrets, confidential knowledge, data or other proprietary information relating to products, processes, know-how, designs, formulas, developmental or experimental work, computer programs, data bases, other original works of authorship, customer lists, business plans, financial information or other subject matter pertaining to any business of the Company or any of its employees, clients, consultants or licensees.

I further agree that for twelve (12) months immediately following the termination of my Relationship with the Company, I shall not either directly or indirectly solicit any of the Company's employees or consultants to terminate their relationship with the Company, or attempt to solicit employees or consultants of the Company, either for myself or for any other person or entity.

Further, I agree that I shall not use any Confidential Information of the Company to negatively influence any of the Company's clients or customers from purchasing Company products or services or to solicit or influence or attempt to influence any client, customer or other person either directly or indirectly, to direct any purchase of products and/or services to any person, firm, corporation, institution or other entity in competition with the business of the Company.

**EMPLOYEE:** Emi Ayada

Signature: _____     Date: _____

# EXHIBIT 2

# Data Management Policy

## Purpose

- To ensure that information is classified, protected, retained, and securely disposed of in accordance with its importance to the organization.
- To define data classification and standards.

## Scope

All company data, information, and information systems.

## Policy

The classification of data and information systems is done in accordance with legal requirements, sensitivity, and business criticality in order to ensure that information is given the appropriate level of protection. Data owners are responsible for identifying any additional requirements for specific data or exceptions to standard handling requirements.

Information systems and applications shall be classified according to the highest classification of data that they store or process.

## Data Classification

To help employees and stakeholders easily understand requirements associated with different kinds of information, the company has created three classes of data.

## Confidential

Highly sensitive data, or Confidential data, requires the highest levels of protection; access is restricted to specific employees or departments, and these records can only be passed to others with approval from the data owner, or a company executive. Example include:

- Customer Data
- Personally identifiable information (PII)
- Company financial and banking data
- Salary, compensation personnel, and payroll information
- Strategic plans
- Incident reports
- Risk assessment reports
- Technical vulnerability reports
- Authentication credentials
- Secrets and private keys
- Source code
- Litigation data

## Restricted

Company proprietary information requires thorough protection; access is restricted to employees with a "need-to-know" based on business requirements. This data can only be distributed outside the company with approval. This is the default for all company information unless stated otherwise. Examples include:

- Internal policies
- Legal documents

- Meeting minutes and internal presentations
- Contracts
- Internal reports
- Slack messages
- Email

# Public

Documents intended for public consumption can be freely distributed outside the company. Examples include:

- Marketing materials
- Product descriptions
- Release notes
- External facing policies

# Labeling Paper

Confidential data should be labeled "confidential" whenever paper copies are produced for distribution.

# Data Handling

# Confidential Data Handling

Confidential data is subject to the following protection and handling requirements:

- Access for non-preapproved roles requires documented approval from the Security Delegate
- Access is granted on an as-needed basis.
- Access is restricted to specific employees, roles, and/or departments
- Confidential systems shall not allow unauthenticated or anonymous access
- Confidential Customer Data shall be handled like Company confidential data.
- Confidential data shall be encrypted at rest and in transit over public networks in accordance with the Cryptography Policy
- Mobile device hard drives containing confidential data, including laptops, shall be encrypted
- Mobile devices storing or accessing confidential data shall be protected by a log-on password (or equivalent, such as biometric) or passcode and shall be configured to lock the screen after fifteen (15) minutes of non-use
- Backups of Confidential data shall be encrypted
- Confidential data shall not be stored on personal phones or devices or removable media including USB drives, CDs, or DVDs
- Paper records shall be labeled "confidential" and securely stored and disposed of in a secure, approved manner in accordance with data handling and destruction policies and procedures
- Hardcopy paper records of Confidential data shall only be created based on a business need and shall be avoided whenever possible
- Hard drives and mobile devices used to store confidential information must be securely wiped prior to disposal or physically destroyed
- Transfer of confidential data to people or entities outside the company shall only be done in accordance with a legal contract or arrangement or as mandated by law or regulation, and the explicit written permission of management or the data owner
- Authentication credentials, including session tokens issued by Clerk, shall be considered Confidential data and must be securely transmitted, stored, and managed in compliance with the Cryptography Policy.

# Restricted Data Handling

Restricted data is subject to the following protection and handling requirements:

- Access is restricted to users with a need-to-know based on business requirements
- Restricted systems shall not allow unauthenticated or anonymous access
- Transfer of restricted data to people or entities outside the company or authorized users shall require management approval and shall only be done in accordance with a legal contract or arrangement, or the permission of the data owner
- Paper records shall be securely stored and disposed of in a secure, approved manner in accordance with data handling and destruction policies and procedures
- Restricted data shall not be stored on personal phones or devices or removable media including USB drives, CDs, or DVDs

## Public Data Handling

No special protection or handling controls are required for public data. Public data may be freely distributed.

## Data Retention

Company shall retain data as long as the company has a need for its use, or to meet regulatory or contractual requirements. Once data is no longer needed, it shall be securely disposed of or archived. Data owners, in consultation with security leadership and/or legal counsel, may determine retention periods for their data.

Personally identifiable information (PII) shall be deleted or de-identified when it no longer has a business use. Retention periods shall be documented in the Data Retention Matrix in Appendix B to this policy.

## Data & Device Disposal

Data classified as restricted or confidential shall be securely deleted when no longer needed. The organization shall assess the data and disposal practices of third-party vendors in accordance with the Third-Party Management Policy. Only third parties who meet company requirements for secure data disposal shall be used for the storage and processing of restricted or confidential data.

Where feasible, all restricted and confidential data will be securely deleted from company devices prior to, or at the time of, disposal. Confidential and Restricted hardcopy materials shall be shredded or otherwise disposed of using a secure method.

Personally identifiable information (PII) shall be collected, used and retained only for as long as the company has a legitimate business purpose. PII shall be securely deleted and disposed of following contract termination in accordance with company policy, contractual commitments and all relevant laws and regulations. PII shall also be deleted in response to a verified request from a consumer or data subject, where the company does not have a legitimate business interest or other legal obligation to retain the data.

## Annual Data Review

Management shall review data retention requirements during the annual review of this policy. Data shall be disposed of in accordance with this policy.

## Legal Requirements

Under certain circumstances, the organization may become subject to legal proceedings requiring retention of data associated with legal holds, lawsuits, or other matters as stipulated by legal counsel. Such records and information are exempt from any other requirements specified within this Data Management Policy and are to be retained in accordance with requirements identified by the Legal department. All such holds and special retention requirements are subject to annual review with the company's legal counsel to evaluate continuing requirements and scope.

## Policy Compliance

The company will measure and verify compliance with this policy through various methods, including but not limited to, business tool reports, and both internal and external audits.

## Exceptions

Requests for an exception to this policy must be submitted to the Security Delegate for approval.

## Violations & Enforcement

Any known violations of this policy should be reported to the Security Delegate. Violations of this policy can result in immediate withdrawal or suspension of system and network privileges and/or disciplinary action in accordance with company procedures up to and including termination of employment.

## APPENDIX A - Internal Retention and Disposal Procedure

Engineering personnel are responsible for setting and enforcing the data retention and disposal procedures for company-managed accounts and devices.

**Customer Accounts:**

1. Customer accounts and data shall be deleted within ninety (90) days of contract termination and data no longer being needed for business purposes through manual data deletion processes.

**Devices:**

1. Employee devices will be collected promptly upon an employee's termination.
2. Remote employees will be sent a shipping label and the return of their device shall be monitored.
3. Collected devices will be cleared to be re-provisioned—or removed from inventory;
4. The company will securely erase the device when reprovisioning.
5. Device images may be retained at the discretion of management for business purposes.
6. The company may employ a third party to manage the above.

**Destroying devices or electronic media**

In cases where a device is damaged in a way that it cannot be accessed in order to erase the drive, the company may optionally decide to use an E-Waste service that includes data destruction with a certificate. Certificates of destruction will be kept on record for one year. Physical destruction can be optional if it is verified that the device is encrypted with Full Disk Encryption, which would negate the risk of data recovery.

## APPENDIX B - Data Retention Matrix

| System or Application | Data Description | Retention Period |
|---|---|---|
| Company SaaS Products | Customer Data | Up to 90 days after contract termination |
| Company Support | Customer instance and metadata, debugging data | Indefinite |
| Company Customer Support Tickets | Support Tickets and Cases | Indefinite |
| Company Customer Support Phone Conversations | Support Phone Conversations | Indefinite |

| Company Security Event Data | Security and system event and log data, network data flow logs | On-Premise - Indefinite<br><br>Cloud/Host Instance - 1 year |
|---|---|---|
| Company Vulnerability Scan Data | Vulnerability scan results and detection data | 6 months<br><br>host (asset) data is retained until removed and purged from the vulnerability management tool |
| Company Customer Sales | Opportunity and Sales Data | Indefinite |
| Company QA and Testing Data | QA, testing scenarios, and results data | Indefinite |
| Security Policies | Security Policies | 1 year after archive |
| Temporary Files | IaaS /tmp ephemeral storage | automatically when the process finishes |

## Document History

| Version | Date | Description | Written by | Approved by |
|---|---|---|---|---|
| 1.0.0 | 2024-10-04 | Initial Version | Ryan Rich | Elmar Kert |